**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANTS:

**THEODORE J. MINCH**
Sovich Minch, LLP (counsel for Mi.A)
McCordsville, Indiana

**CARA SCHAEFER WIENEKE**
Wieneke Law Office, LLC (counsel for C.A.)
Plainfield, Indiana

ATTORNEYS FOR APPELLEE:

**KRIS MELTZER**
DCS Shelby County
Shelbyville, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: M.A. (minor child); | ) ) ) ) | |
| Mi.A. and C.A., | ) ) | |
| Appellants-Respondents, | ) ) | |
| vs. | ) ) | No. 73A01-1209-JT-411 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE SHELBY SUPERIOR COURT
The Honorable Jack A. Tandy, Judge
Cause No. 73D01-1202-JT-1

**August 13, 2013**

**August 13, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

STATEMENT OF THE CASE

C.A. ("Mother") and Mi.A. ("Father") appeal the termination of their parental rights as to their minor child, M.A.

We affirm.

ISSUES

1. Whether the juvenile court erred in concluding that there was clear and convincing evidence to support the termination of Mother's parental rights.

2. Whether the juvenile court erred in concluding that there was clear and convincing evidence to support the termination of Father's parental rights.

FACTS AND PROCEDURAL HISTORY

M.A. was born on October 22, 2010, and on January 5, 2011, she was removed from Mother's care after the Shelby County Department of Child Services ("SDCS") confirmed that Mother used methamphetamine and smoked marijuana while in the presence of two-month-old M.A. Father was not living with Mother at the time, and SDCS asked him to care for M.A. However, Father responded that he had drug and legal problems that prevented him from caring for his child.

2

SDCS placed M.A. in the homes of two different relatives; however, the placements failed due to financial and health problems. In July 2011, SDCS placed M.A. in a foster home, where she stayed for all but one week during the period leading up to the July 2012 termination hearing.

SDCS filed a CHINS petition, and on February 17, 2011, the juvenile court, based on each parent's admission, adjudicated M.A. to be a CHINS. On February 27, 2011, Mother was arrested for domestic battery for striking Father. She was released from custody in mid-March 2011.

On May 5, 2011, both Mother and Father were arrested for dealing in a controlled substance as a Class B felony. Mother did not bond out of jail after her May 2011 arrest and was sentenced on December 14, 2011 to a term of eight years executed to the Department of Correction (the "DOC") after pleading guilty to the Class B felony charge. Meanwhile, Father bonded out of jail after his arrest and accepted services pursuant to the juvenile court's dispositional order. However, on June 13, 2012, Father was sentenced to a term of eight years executed to the DOC after pleading guilty to two Class B felony charges.

Before being incarcerated, Mother participated in home-based services and drug rehabilitation services through the Gallahue Mental Health Center. During this period, Mother initially did not use drugs and participated in unsupervised visits with M.A. However, Mother relapsed before her arrest for dealing in a controlled substance and began to use methamphetamine. Indeed, even though the arrest for dealing did not occur

3

until May 2011, the drug sale that precipitated the arrest occurred only two months after M.A. was removed from Mother's care.

Mother participated in a number of rehabilitation programs in prison, some of which would shorten her sentence if successfully completed. Mother was prevented from visiting with M.A. by prison policy and "issues with scabies and lice and lots of different parasite outbreaks." (Tr. 31).

During the time that Father was out on bond on the drug charge, he and his two daughters from a previous relationship exercised supervised visitation with M.A. A Court Appointed Special Advocate ("CASA") was assigned to the case, and she testified that the visitations helped develop a bond between Father and M.A. Father participated in some treatment programs before his prison term began, but his treatment was limited during his imprisonment.

After it became apparent that reunification was hindered by both parents' incarceration, SDCS determined that involuntary termination and adoption by the foster parents was in M.A.'s best interests. Both the case manager, Sirena Shouse, and the CASA, Kelly Smith-Ford, testified at the termination hearing that Mother's and Father's continued incarceration was the determining factor in SDCS's decision because M.A. was beginning to exhibit "problems with attachment" or "reactive attachment disorder" because of the numerous changes in her environment and in her caretakers. (Tr. 26, 48). This disorder manifested itself in M.A.'s struggles with attachment to women, her

sleeping problems, her refusal to eat, and her attendant problems with "bowel movements." (Tr. 26).

After the July 24, 2012 termination hearing, the juvenile court made the following relevant findings:

11. After formal removal of the Child per the Dispositional Decree of March 30, 2011, the Child was never returned to her parents' care and custody.

12. The parents' relationship continued to be marred by domestic violence. Mother was arrested for Domestic Battery on Father on February 27, 2011. She was released from custody in mid-March 2011.

13. On May 5, 2011, both parents were arrested for Dealing in a Controlled Substance as a Class B felony.

14. Mother never bonded out of jail after her May 2011 arrest and was sentenced on December 14, 2011 to a term of 8 years executed to the [DOC] after pleading guilty to Dealing in a Controlled Substance as a Class D felony.

15. Father did bond out of jail after his arrest and accepted services pursuant to the Court's Dispositional Order. However, on June 13, 2012, Father was sentenced after pleading guilty to two counts of Dealing in a Schedule IV Controlled Substance as a Class B felony and as a Class C felony. Father's sentence was 15 years to the [DOC] with 8 years executed and seven years suspended.

16. Father has a lengthy criminal record with convictions for drug and property crimes and crimes of violence including Battery, Domestic Battery, and Criminal Confinement. Father has had probation revoked on 5 occasions.

17. Mother has completed several programs while in the Indiana Department of Correction and is attempting to improve her life. However, mother's criminal record is lengthy with numerous felony and misdemeanor convictions including property crimes, drug

5

crimes, and crimes of violence. Mother has had her probation revoked numerous times in the past.

18. During the week of June 27, 2011, [a relative] informed SDCS she could no longer take care of the Child. The Court placed Child with [the foster parents].

19. Child has been with [the foster parents] for most of the Child's life. Mother and Father [unsuccessfully] attempted to locate family members to provide care for the Child. In the Order on Periodic Review dated October 21, 2011, the Child was placed in relative placement with [two relatives]. However, [one relative] contacted the foster parents within approximately one week and requested that the Child be returned to their care. The Child was returned to the care of foster parents by court order on October 31, 2011.

\* \* \* \* \*

21. The CASA, Kelly Smith-Ford, testified that adoption and termination of parent rights were in the Child's best interests. The CASA also filed a written report with the Court which is made a part hereof by reference, and which expresses the same sentiment as her testimony.

22. SDCS's plan for the Child is that she be adopted; this plan is satisfactory for the Child's care and treatment.

23. The Child has been in the same foster home for most of her life. The child is very bonded with [the foster parents], and they are willing to adopt the Child.

(App. 30-32).

The juvenile court concluded the following (among other things):

There is a reasonable probability that:

a. The conditions which resulted in Child's removal and continued placement outside the home will not be remedied;

6

b.  That continuation of the parent-child relationship poses a threat to the Child's well-being.

The parents are both incarcerated and not able to meet their daughter's needs. Each parent is serving an executed eight-year sentence and is not expected to be released from prison until at least 2015. Each parent has had significant criminal and specifically substance abuse problems in their life. Each parent's substance abuse issues have significantly impaired their ability to appropriately parent their children, including [M.A.]. While the Court hopes the parents successfully rehabilitate themselves, each parent's prognosis for a crime-free life is poor given their history.

(App. 34). The juvenile court terminated both parents' parental rights.

Additional facts are discussed below as necessary.

## DISCUSSION AND DECISION

The traditional right of parents to establish a home and raise their child is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). Parental rights may be terminated when parents are unable or unwilling to meet their parental responsibilities. *Id.* The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*, *cert. denied.*

When DCS seeks to terminate parental rights pursuant to Indiana Code § 31-35-2-4(b)(2), it must plead and prove in relevant part:

(A) that one (1) of the following is true:
(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

7

* * * *

(B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied;
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child;
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services.

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

These allegations must be established by clear and convincing evidence. *In re I.A.*, 934 N.E.2d 1127, 1133 (Ind. 2010).

Because subsection (b)(2)(B) is written in the disjunctive, DCS need prove only one of the elements by clear and convincing evidence. *See I.A.*, 934 N.E.2d at 1133. Thus, if we hold that the evidence sufficiently shows that there is reasonable probability that the reasons for continued placement outside the home of the parents will not be remedied, we need not address whether the continuation of the parent-child relationship poses a threat to the well-being of the child. *See* I.C. § 31-35-2-4(b)(2)(B); *In re A.N.J.*, 690 N.E.2d 716, 721 n.2. (Ind. Ct. App. 1997).

1.    Termination of Mother's Rights
      *a.*     *Conditions Remedied*

Mother contends that the juvenile court erred in concluding that the conditions that resulted in M.A.'s continued placement outside Mother's home would not be remedied.

8

For the most part, Mother cites her own testimony from the termination hearing in support of her contention, while occasionally citing testimony by SDCS employees and the CASA that indicated Mother was doing well in the various classes she took while in prison. In essence, Mother is asking us to reweigh the evidence.

The juvenile court should judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. "However, a parent's habitual patterns of conduct must also be considered to determine whether there is a substantial probability of future neglect or deprivation." *Id.* "[A] juvenile court does not need to wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship." *Castro v. Ind. Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied*. When the evidence shows that the emotional and physical development of a child is threatened, termination of parental rights is appropriate. *Id.*

The juvenile court may consider a parent's history of neglect, failure to provide support, lack of adequate housing and lack of employment, among other things. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). DCS is not required to rule out all possibilities of change; rather it need establish only that there is a reasonable probability that the parent's behavior will not change. *In re Kay.L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Here, the juvenile court's findings and conclusion are based on testimony that Mother has had numerous opportunities to change the behavior that resulted in incarceration. Mother has not made the changes in the past. Indeed, she initially showed progress in overcoming her drug addiction during the beginning of the CHINS process, only to relapse. During the CHINS process, she also committed the drug-related offense that resulted in her current incarceration. Although there is evidence to support Mother's contention that she is doing well in DOC-provided classes and that her release date has been changed to reflect progress in one class, there is a multitude of evidence to support the juvenile court's finding that Mother's newfound success will not last. Furthermore, there is also evidence that M.A. is already suffering from reactive attachment disorder. There is no indication that this disorder would improve during Mother's further incarceration, and we cannot conclude that an earlier release date will undo the damage that has already been done. Given the onset of the reactive attachment disorder and Mother's history of drug abuse and incarceration, we cannot say that the juvenile court abused its discretion in making its findings and concluding that the reasons for placement outside the home will not be remedied. In short, we will not reweigh the evidence and give credit to testimony that the juvenile court rejected.

*b. Best Interests*

With regard to the "best interests of the child" statutory element, the juvenile court is required to consider the totality of the evidence and determine whether the custody by the parent is wholly inadequate for the child's future physical, mental, and social growth.

10

*In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. In making this determination, the juvenile court must subordinate the interest of the parent to that of the child involved. *Id.* The recommendations of the CASA and the child's caseworker that parental rights be terminated support a finding that termination is in the child's best interests. *See A.J. v. Marion County Office of Family and Children*, 881 N.E.2d 706, 718 (Ind. Ct. App. 2008), *trans. denied*.

Here, M.A.'s CASA representative testified that termination was in M.A.'s best interests because of the length of Mother's incarceration. M.A.'s case manager concurred with the CASA representative's testimony. Although the length of Mother's incarceration was shortened after the termination hearing, there is no evidence that the shortened period will result in the permanent alleviation of the symptoms of M.A.'s reactive attachment disorder. This disorder is alleviated by consistent contact with a loving female mother figure like M.A.'s foster mother; it cannot be alleviated by a Mother whose history shows that she will be consistently absent from M.A.'s life. Thus, the juvenile court did not err in terminating Mother's parental rights to M.A.

2.  Termination of Father's Rights
    a.  *Conditions Remedied*

Father contends that the juvenile court erred in concluding that the conditions resulting in M.A.'s continued placement outside his custody will not be remedied. He points to evidence that he bonded with M.A. during the times he was not incarcerated and that he informed the juvenile court at the termination hearing that although other

11

placements with relatives had failed, he had another relative willing to assume custody of M.A. during Father's current incarceration.

The juvenile court acknowledged that Father accepted services pursuant to the court's dispositional order and that Father had attempted to locate family members to provide for M.A. during Father's incarceration. However, the juvenile court also found that Father's efforts were insufficient given his extensive criminal history and his current incarceration. We have repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro*, 842 N.E.2d at 375. Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

Here, as the juvenile court concluded, Father has consistently demonstrated an inability to stop using illegal drugs, to avoid incarceration, or to provide M.A. with the safe, stable, and drug-free environment that she needs. Indeed, Father has consistently shown his disdain for the criminal justice system by violating terms of probation. Accordingly, we cannot conclude that the juvenile court abused its discretion in finding that the reasons for placement outside Father's home will not be remedied.[1]

b. *Best Interests*

---

[1] We note that the family-related custodian referred to by Father wrote a letter to the juvenile court expressing a desire to adopt M.A. However, the family-related custodian did not attend the termination hearing, and Father has not shown that the juvenile court erred in not granting custody to another family member.

Father contends that the juvenile court abused its discretion in determining that termination of Father's parental rights was in M.A.'s best interests. Father's primary argument is that the juvenile court failed to consider his "historical data," which if "seriously considered by the [juvenile] court" did not support termination. (Father's Br. 15).

A parent's historical inability to provide a suitable environment along with the parent's current inability to do so support a finding that termination of parental rights is in the best interests of the child. *See Lang v. Starke County OFC*, 861 N.E.2d 366, 373 (Ind. Ct. App. 2007), *trans. denied.* A fact finder properly considers evidence of a parent's history of neglect, failure to provide support, and lack of adequate housing and employment. *See Matter of D.G.*, 702 N.E.2d 777, 779 (Ind. Ct. App. 1998). Here, the juvenile court concluded that Father's cooperation with DCS during the time before his most recent incarceration was outweighed by his use of illegal drugs, his history of constant incarceration, and his inability to provide a stable home for M.A. We cannot disagree with the juvenile court, especially given the Father's engagement in criminal activity after the initiation of the CHINS proceeding. Therefore, the juvenile court did not err in terminating Father's parental rights to M.A.

## CONCLUSION

We conclude there was clear and convincing evidence to support the juvenile court's decision to terminate Mother's and Father's parental rights to M.A. We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us

13

with a definite and firm conviction that a mistake has been made." *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992).  We find no such error here and, therefore, affirm the juvenile court.

Affirmed.

KIRSCH, J., and VAIDIK, J., concur.